UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
JOSEPH DANIELS,

                        Plaintiff,

    -against-

1710 REALTY LLC, a/k/a 1710 REALTY
ASSOCIATES,
                      Defendant.
--------------------------------------------------------X

10-CV-0022 (RER)

**FINDINGS OF FACT &**
**CONCLUSIONS OF LAW**

**RAMON E. REYES, JR., United States Magistrate Judge:**

Plaintiff Joseph Daniels ("Daniels" or "plaintiff") brought this action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206-207, 216(b), against defendant 1710 Realty LLC ("1710") for unpaid minimum and overtime wages. Daniels also seeks damages for not being paid weekly in violation of Section 191 of the New York Labor Law. The parties have consented to my jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (Docket No. 25.) A bench trial was held on April 6, 2011. (Docket No. 39). This constitutes the Court's findings of fact and conclusions of law.

**FINDINGS OF FACT**

**I.    The Parties**

1710 owns and operates an apartment building located at 1710 Union Street, Brooklyn, New York (the "Building"). (Docket No. 33, Joint Pretrial Order, Stipulated Facts ¶ 1). Wolf Sicherman ("Sicherman") is a member of 1710. (Sicherman Testimony, Tr. at 81:12-17).[1] Sicherman has been managing residential property since 1978. (*Id.* at 82:4-7). Through his management company, Sicherman currently manages between eighteen and twenty residential

---

[1] Citations to "Tr." are to the trial transcript. (Docket No. 39.)

apartment buildings, all but one of which are located in Brooklyn. (*Id.* at 126:25-127:4). The residential apartment buildings that Sicherman's company manages range in size from eight to one hundred forty residential units, and some of which are comparable in size to the Building. (*Id.* at 89:16-23; 112:10-15; 127:5-11).

On April 15, 1994, Daniels began working for Sicherman's management company as a handyman. (Daniels Testimony, Tr. at 7:13-18). At the time, Sicherman's management company utilized the services of "The Super Agency," which provided several handymen who were able to perform various jobs for Sicherman's residential properties. (Sicherman Testimony, Tr. at 81:20-82:3). As a handyman, Daniels' responsibilities included handling minor repairs, such as fixing leaky faucets and door locks, and replacing air valves. (*Id.* at 82:23-83:25). Daniels performed these services on an as-needed basis for a number of Sicherman's company's properties. Daniels was paid an hourly rate for his services. (*Id.* at 82:23-83:12). Daniels worked as a handyman for Sicherman's management company for about four months. (Daniels Testimony, Tr. at 7:19-21).

Sicherman hired Daniels as a superintendent for the Building in August 1994. (Daniels Testimony, Tr. at 7:13-24; Sicherman Testimony, Tr. at 81:21-82:3; 87:20-88:24). Daniels employment was terminated in August 2009. (Daniels Testimony, Tr. at 14:16-20; Joint Pretrial Order, Stipulated Facts ¶ 3).

## II. The Building and Daniels' Duties

The Building is a four-storey apartment building with thirty-nine residential and approximately seven commercial units. (Daniels Testimony, Tr. at 37:21-38:15).[2] Daniels only had responsibility with respect to the residential units. (*Id*.). Daniels' primary duties were to sweep and mop the Building, and to take care of the garbage on a daily basis. (*Id.* at 17:18-18:4; Itzkowitz Testimony, Tr. at 136:11-15; Sicherman Testimony, Tr. at 111:18-112:3). Daniels was also required to do minor plumbing and electrical repairs, and minor plastering and painting. (Daniels Testimony, Tr. at 18:5-7; Sicherman Testimony, Tr. at 112:3-9; Itzkowitz Testimony, Tr. at 136:16-17).

With respect to plumbing, Daniels admitted that beginning in 2006 all major repairs and renovations were handled by outside contractors. (Daniels Testimony, Tr. at 60:9-61:15; 62:10-63:12; 64:15-65:16). Although he could not recall with any specificity how often he performed minor plumbing repairs, Daniels conceded that on average it could have been as infrequent as once every three months. (*Id*. at 65:5-16).

With respect to painting, Daniels did minor touch-ups in the apartments as a result of water damage only in cases of emergency. (*Id*. at 52:6-53:12). Daniels could not recall how often he did such touch-ups, except to say that it was not a regular occurrence. (*Id*. at 52:4-

---

[2] A Google Maps search of 1710 Union Street reveals that the commercial units occupy the ground storey, and the residential units occupy the top three storeys. *Cf. United States v. Bari*, 599 F.3d 176, 180-81 (2d Cir. 2010) (district court did not commit reversible error when it conducted independent Internet research to confirm its intuition that there were many types of yellow rain hats available for sale); *Rindfleisch v. Gentiva Health Sys., Inc.*, No. 10-CV-2111, 2010 WL 3980182, at *11 n. 13 (E.D.N.Y. Oct. 8, 2010) ("Courts commonly use internet mapping tools to take judicial notice of distance and geography.")

53:13). Plaintiff also performed painting touch-ups in the Building's hallways, but could not recall how often he did so. (*Id*. at 53:14-54:19). Daniels also repainted the Building's lobby periodically, but conceded that this job only took him between two hours to two days each time. (*Id.* at 55:17-57:21).³ Daniels alternately claimed that he repainted the lobby every year, or once every three years. (*Id*. at 55:17-56:11). Plaintiff also repainted the hallways of each floor, and it took him two hours to do so. (*Id.* at 56:19-57:18). He could not recall, however, how often he performed this task. (*Id.* at 57:19-21).

With respect to plastering, Daniels testified that he only did minor plastering work, and that most plastering was performed by outside contractors. (*Id.* at 70:6-71:12). Plaintiff could not recall whether he did any plastering work within the last three years of his employment with 1710. (*Id.*).

### III. Daniels' Work Hours

Daniels testified that his supervisor Max Itzkowitz ("Itzkowitz"), who he knew as "Marthy," once told him in 1995 that his work hours were from 8:00 a.m. to 6:00 p.m. on weekdays. (*Id.* at 42:16-43:10). Daniels admitted that he sometimes began his day at 8:30 a.m., and ended as early as 5:00 p.m., or started before 8:00 a.m. and ended after 6:00 p.m. (*Id.* at 17:1-6; 71:18-25; 72:1-8; 74:1-17). Regardless, when plaintiff returned to his apartment at the end of his day, he was free to do whatever he wanted and that time was his own. (*Id.* at 74:18-75:5). In response to a leading question, Daniels testified that he would respond to tenant emergencies

---

³ During his deposition, Daniels stated that it took two days to paint the lobby. (Daniels Testimony, Tr. at 56:12-15). His retreat at trial to two hours for this task was not followed up by his counsel.

after 6:00 p.m. (*Id.* at 17:7-17). After the objection was sustained, Daniels did not testify further regarding this issue.

Itzkowitz was a property field manager for 1710 during the majority of plaintiff's tenure as building superintendent. (Itzkowitz Testimony, Tr. at 130:11-21). Itzkowitz denies ever telling Daniels what his work hours were. (*Id.* at 134:1-3). During the period Daniels worked for 1710, Itzkowitz visited the Building every other day, or on average three times per week, for about ten to twenty minutes. (*Id.* at 131:4-23; 134:14-17). Itzkowitz testified that during these visits he rarely saw Daniels, who was often not at the Building for a variety of reasons, including running personal errands or attending various appointments. (*Id.* at 134:18-135:9).

Sicherman testified that when he hired Daniels, he informed him that the position of superintendent required only five to six hours of work per day, Monday to Friday. (Sicherman Testimony, Tr. at 88:18-23; 89:9-23; 112:19-23).

Daniels admits that on most Mondays through Thursdays, and on Sundays, he left the Building at 2:30 p.m. and drove his wife to work at the Green Park Nursing Care Center located at 140 St. Edwards Street in Brooklyn. (Daniels Testimony, Tr. at 19:15-19; 20:4-15; 69:8-10). Plaintiff returned to the Building after dropping off his wife at work each day at around 3:00 p.m. or later depending on traffic. (*Id.* at 69:8-12). Daniels always took his lunch break at about 3:00 p.m. and returned to work at about 3:30 p.m. each day. (*Id.* at 69:13-18). On the days that plaintiff's wife did not work, including Fridays, plaintiff often ate lunch with her during his lunch hour. (*Id.* at 68:12-22).

Itzkowitz, whose regular hours were 9:00 a.m. to 5:00 p.m., did not contact plaintiff after 5:00 p.m. and was never contacted by plaintiff after 5:00 p.m. (Itzkowitz Testimony, Tr. at

136:22-137:6). Sicherman had no knowledge of any work performed by plaintiff after the end of his workday. (Sicherman Testimony, Tr. at 104:5-8). Sicherman testified that if a tenant had a request after hours, they were provided a telephone number that they could call, and the call would be routed to a handyman who could assist them. (*Id.* at 104:5-105:3).

Daniels testified inconsistently at deposition and trial with respect to whether he worked on Saturdays. Plaintiff, a Seventh-Day Adventist, testified at deposition that: (i) "Yes, I don't work Saturdays"; but also (ii) that he worked a couple hours on Saturdays prior to church services. (Daniels Testimony, Tr. at 48:24-49:1; 49:9-16; 50:2-51:11). Ultimately, however, Daniels contends that he worked two hours every Saturday before attending church services, and five hours every Sunday. (*Id.* at 15:11-22; 79:3-13). Daniels admits, however, that he was never told by anyone at 1710 that he was required to work on Saturdays or Sundays, and he decided on his own to work on weekends. (*Id.* at 43:11-21, 45:24-46:9; 51:12-17). Daniels contended at trial that at some point he thought he told Itzkowitz that he worked on Saturdays and Sundays, although he could not say when that conversation took place. (*Id.* at 43:22-44:8; 44:17-19; 44:24-45:12; *but see id.* at 51:18-21 (Daniels testified that he never told anyone that he worked on Saturdays)).

Sicherman testified that Daniels never informed him that he worked on Saturdays or Sundays. (Sicherman Testimony, Tr. at 114:18-115:2). Itzkowitz, who Daniels admits never visited the Building or spoke with Daniels on weekends, also testified that Daniels never told him that he worked on Saturdays and Sundays. (Itzkowitz Testimony, Tr. at 133:8-12; 135:21-136:10; Daniels Testimony, Tr. at 44:12-16; 45:13-17).

## IV. Daniels' Compensation

From January 2008 to the end of plaintiff's employment in August 2009, the relevant time period for purposes of this action, 1710 paid plaintiff wages of $600 semi-monthly. (Joint Pretrial Order, Stipulated Facts ¶ 7; Daniels Testimony, Tr. at 14:21-23).

A couple of months after Daniels was hired as a superintendent, a residential unit became available in the Building, and Sicherman offered him the apartment, which plaintiff accepted. (Sicherman Testimony, Tr. at 88:25-89:5). Throughout most of his employment with 1710, plaintiff resided in Unit B-5, which consisted of two bedrooms, a kitchen, and a living room. (Daniels Testimony, Tr. at 23:5-23). According to Daniels, the rent for apartments comparable to Unit B-5 during the relevant period was $800. (*Id.* at 23:17-24:14). Plaintiff was not required to pay rent or utilities, including electricity and gas, for this apartment. (Joint Pretrial Order, Stipulated Facts ¶ 6).

## CONCLUSIONS OF LAW

The Complaint was filed on January 5, 2010, and alleges three causes of action against 1710: (1) failure to pay minimum wage and overtime in violation of the FLSA; (2) failure to pay minimum, overtime, and spread-of-hours wages in violation of New York Labor Law; and (3) failure to pay plaintiff's wages weekly in violation of Section 191 of the New York Labor Law. Daniels has since withdrawn his minimum wage, overtime, and spread-of-hours claims under the New York Labor Law. (Docket No. 17). Thus, only the first and third causes of action remain to be adjudicated. (Joint Pretrial Order, at 2-3).

### I. The Court Cannot Conclude That Daniels Worked More Than 40 Hours During the Week

Under the FLSA, an employee "has the burden of proving that he performed work for which he was not properly compensated." *Rivera v. Ndola Pharmacy Corp.*, 497 F. Supp. 2d 381, 388 (E.D.N.Y. 2007) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). "When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records." *Anderson*, 328 U.S. at 687. When no such records exist, the employee may meet this burden if he proves that he has in fact performed work for which he was improperly compensated. *Id*.

In order to meet this burden, the plaintiff must produce "*sufficient* evidence to show the amount and extent of that work as a matter of *just and reasonable inference*." *Id.* (emphasis added). An employee can rely solely on his own recollections to meet this initial burden, *Rivera*, 497 F. Supp. 2d at 388, and if the trial court finds the testimony credible, it can award damages based on an approximation of the employee's loss. *See Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 67 (2d Cir. 1997). If the plaintiff meets this burden, "the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 118 (S.D.N.Y. 2009). Although the "just and reasonable inference" often carries the day for an FLSA-plaintiff, it does not do so here for the following reasons.

First, Daniels testimony that he was told to work from 8:00 a.m. to 6:00 p.m. each weekday is unconvincing. Daniels did not testify with any specificity as to when and where "Marthy" told him this, whether it was in person or on the telephone, or anything else that would

lend any credibility whatsoever to Marthy's purported statement. (Daniels Testimony, Tr. at 42:16-43:10). Moreover, such an assertion flies in the face of Itzkowitz's testimony, which I find credible, that he never said as such to Daniels. (Itzkowitz Testimony, Tr. at 134:1-3). It also flies in the face of Sicherman's testimony, which I also find credible, that upon hiring Daniels he informed Daniels that he was required to work between five to six hours per day (30 hours per week), which is what Sicherman tells to all the superintendents he hires for buildings of this size. (Sicherman Testimony, Tr. at 88:18-23; 89:9-23; 112:16-23).[4] Based on the substance of the testimony and the witnesses' demeanor, I simply cannot find credible Daniels' testimony that Itzkowitz told him he was required to work from 8:00 a.m. to 6:00 p.m.—50 hours per week.

Second, although an FLSA plaintiff may rely on his own testimony to establish the hours he worked, Daniels' vague testimony concerning the tasks he actually performed each and every day does not provide me with a sufficient basis to determine as a matter of just and reasonable inference that he actually worked those hours on a regular basis, or even at all. Daniels vague description of the specific tasks he performed is in no way indicative of a full-time job. For example, Daniels did not describe how long it would take him each day to sweep and mop the Building's common hallways, or dispose of the garbage. Daniels merely answered affirmatively to the question ""[a]nd the things you did as a super, did that keep you busy from the time you've testified that you worked?" (Daniels Testimony, Tr. at 18:8-10). Based on Daniels' description

---

[4] I reject Daniels' argument that this testimony should be disregarded as improper because 1710 did not call other superintendents to provide corroborative testimony. Sicherman's experience in the industry is highly relevant to this inquiry, and no corroboration was required.

of the Building and what he did on a daily basis, it is simply not plausible, let alone reasonable to infer that he worked 10 hours per day as he claims.

Daniels' testimony concerning the minor plumbing, plastering, and painting tasks he performed is similarly insufficient. Even crediting Daniels' vague account of how long it took him to perform such repairs, these aspects of his job occurred infrequently at best. There is simply nothing in the record from which to conclude as a matter of just and reasonable inference that Daniels performed minor painting, plastering, and plumbing repairs frequently enough to supplement or extend his regular hours.[5]

Third, I also find unpersuasive Daniels contention that he was "on call . . . at all hours of the day." (Complaint at ¶ 21). The U.S. Department of Labor's regulations promulgated under the FLSA provide that "[a]n employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call.'" 29 C.F.R. § 785.17. When an employee is not confined to his home or any particular place and may come and go as he pleases, the "hours spent 'on call' are not considered as hours worked." *Nonnenmann v. City of New York*, No. 02 Civ. 10131, 2004 U.S. Dist. LEXIS 8966, at *88 (S.D.N.Y. May 20, 2004) (citing 29 C.F.R. § 778.223); *see also Singh v. City of New York*, 524 F.3d 361, 368, n. 4 (2d Cir. 2008) (holding that employees may seek compensation for time spent "on call" when their employer restricts their ability to use time freely for their own benefit).

---

[5] Daniels' testimony that he "regularly" performed such minor repairs is of no avail. (Daniels Testimony, Tr. at 58:4-16.) Even he admits that such repairs were done as infrequently as once per month. (*Id.* at 59:8-16.) Of course, Daniels did not testify as to how long on average it would take him to perform these repairs.

Daniels testified that no restrictions were placed upon him after the end of his workday. When he returned to his apartment at the end of his workday he was free to do whatever he pleased, and that time was his own. (Daniels Testimony, Tr. at 74:18-75:5). Daniels otherwise failed to offer specific testimony as to the frequency with which he was called by tenants after 6:00 p.m. to respond to emergencies. At best, Daniels testified that this occurred "usually." (*Id.* at 52:13-53:13.) In this context, "usually" is virtually meaningless, and does not provide me with any basis, let alone a reasonable one, to determine that Daniels was called upon to work after 6:00 p.m. on more than an occasional basis.

Testimony from Itzkowitz and Sicherman corroborate that Daniels was rarely, if ever, called upon to work after 6:00 p.m. Itzkowitz, whose regular hours were 9:00 a.m. to 5:00 p.m., did not contact plaintiff after 5:00 p.m. nor was he ever contacted by plaintiff after 5:00 p.m. (Itzkowitz Testimony, Tr. at 136:22-137:6). Sicherman also had no knowledge of any work performed by plaintiff after the end of his work day. (Sicherman Testimony, Tr. at 104:5-8). In fact, if a tenant had a request after hours, there was a number that they could call that would be routed to a handyman who could assist them. (*Id.* at 104:5-17).

I recognize that the FLSA "just and reasonable inference" standard is not high. Nevertheless, without a more specific description of the tasks Daniels performed on a daily basis, how long it took him to perform such tasks, how often he was called upon to do repairs or work "after hours," and how long it took him to do so, it is simply impossible for the Court to determine the hours Daniels actually worked on a regular basis, even as a matter of just and reasonable inference. This case is not akin to the many cases involving commercial businesses with regular operating hours where courts or juries have rendered verdicts in favor of plaintiffs

based solely on their plausible testimony that they worked a certain "shift" resulting in a certain number of hours per week. Daniels' testimony regarding the "shift" he worked is not credible. Given that the Building had no regular operating hours and was literally "open" 24 hours, 7 days per week, Daniels cannot meet the just and reasonable inference standard merely by testifying that he worked "X" number of hours per week. More must be shown. An FLSA plaintiff's testimony must be credible, and at least consistent with other evidence in the case; here, Daniels' testimony is not. Even giving Daniels the benefit of all reasonable inferences that can be drawn from the facts, he has failed to establish that on average he worked more 40 hours during the week.[6]

## II. Daniels is Not Entitled to Compensation for Hours He May Have Worked on Weekends

Daniels is not entitled to compensation for hours he may have worked on weekends. "Case law in this Circuit instructs that an 'employee . . . is only entitled to compensation for those hours of work of which the employer had actual or constructive knowledge.'" *Kuebel v.*

---

[6] In reaching this decision I am deducting 1 hour from each work day for Daniels' lunch hour. Daniels' testimony establishes that on Mondays through Thursdays, he drove his wife to work, which took at least thirty minutes depending on traffic. (Daniels Testimony, Tr. at 19:15-19; 20:4-15; 69:8-12). Plaintiff then took about a 30-minute break to eat lunch. (*Id*. at 69:13-18). On the days that Daniels' wife did not work, he took his lunch hour with her. (*Id*. at 68:12-22). To qualify as a meal period, the employee must be relieved from duty during the meal period. *Reich*, 121 F.3d at 64-65. An employee is relieved from duty when the employee's time is not spent predominantly for the benefit of the employer. *Id.* Meal periods are not compensable. *See* 29 C.F.R. § 785.19(a). I reject as unsupported by the evidence Daniels' contention that he was required to eat his meals during "rest breaks." "Rest periods . . . of 5 minutes to about 20 minutes [] are common in industry . . . [t]hey must be counted as hours worked." 29 C.F.R. § 785.18. If an employee is not completely relieved of his duties at meal time, then the employer must pay the time spent on meal periods at the regular rate of pay. *Reich*, 121 F.3d at 64-65; *Conzo v. City of New York*, 667 F. Supp. 2d 279, 287 (S.D.N.Y. 2009). Because Daniels' time during these one-hour breaks was completely his own, I find that they constitute meal periods and not rest breaks, and therefore they are not compensable.

*Black & Decker (U.S.) Inc.*, No. 08-CV-6020, 2010 U.S. Dist. LEXIS 46533, at *42 (W.D.N.Y. May 12, 2010) (quoting *Singh*, 418 F. Supp. 2d at 397); *see also Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998) (holding that an employee is not working for the employer's benefit if the employer has no knowledge of it). Daniels has the burden of proving that the work performed was "spent with the employer's actual or constructive knowledge." *Holzapfel*, 145 F.3d at 521.

Daniels testified at trial that he worked two hours every Saturday and five hours every Sunday. (Daniels Testimony, Tr. at 15:11-22; 79:3-13). Daniels admitted, however, that no one from 1710 ever told him that he was required to work on weekends. (*Id.* at 45:21-46:6; 51:12-17). Rather, Daniels decided on his own to work weekends (*id.* at 46:1-9), and claims he so informed Itzkowitz at some unspecified time in the past (*id.* at 43:22-44:8; 44:17-19; 44:24-45:12; *but see id.* at 51:18-21 (Daniels testified that he never told anyone that he worked on Saturdays)). Sicherman and Itzkowitz testified that they had no knowledge of or reason to believe that plaintiff ever worked on weekends. (Sicherman Testimony, Tr. at 114:18-115:2; Itzkowitz Testimony, Tr. at 133:8-12; 135:21-136:10). I credit Itzkowitz's and Sicherman's testimony over Daniels'.

Daniels has failed to sustain his burden to prove that 1710 knew or should have known that he worked weekends. Nothing in Daniels' description of his duties as a superintendent, or his interactions with Itzkowitz, Sicherman, or anyone else from 1710, indicates that 1710 was on notice that Daniels worked weekends. Daniels' testimony that he told Itzkowitz that he worked weekends is simply not credible, especially in the face of Itzkowitz denial that he was aware that

Daniels worked weekends. Therefore, Daniels is not entitled to compensation for any hours he may have worked on weekends.

## II. Daniels' Compensation Was Sufficient Under the FLSA

Finding as a matter of just and reasonable inference that Daniels worked no more than 40 hours per week leads to the conclusion that he was properly compensated under the FLSA. It is undisputed that Daniels received $600 semi-monthly during the statute of limitations period—$1200 per month. (Joint Pretrial Order, Stipulated Facts, ¶ 7).[7] Daniels contends that the value of his apartment during this period—$800—should be included in the calculation of his regular wage rate, and I agree. *See* 29 U.S.C. § 203(m) ("'Wage' paid to any employee includes the reasonable cost . . . to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees . . ."); 29 C.F.R. § 778.116 ("Where payments are made to employees in the form of goods or facilities which are regarded as part of wages, the reasonable cost to the employer *or the fair value of such goods or furnishing such facilities* must be included in the regular rate." (emphasis added); *cf. Soler v. G. & U., Inc.*, 833 F.2d 1104, 1109 (2d Cir. 1987) ("[T]he explicit reference to housing and board in § 3(m) implies that reasonable costs of those facilities are presumptively compensation.").[8] Thus, Daniels was paid $2000 per month in regular wages.

---

[7] Daniels asks that I equitably toll the FLSA's 2- to 3-year statute of limitations. (*See, e.g.*, Joint Pretrial Order at 2 ("Plaintiff makes this claim for the entire period of his employment under the doctrine of equitable tolling . . . .")). Equitable tolling, even were it warranted, would not help Daniels. There is nothing in the record from which to conclude that Daniels worked more than 40 hours per week prior to the FLSA's statute of limitations period given the vagueness of his testimony concerning the tasks he performed and how long it took him to do them. Thus, even if the statute of limitations were equitably tolled, Daniels would not be entitled to relief under the FLSA.

[8] I have considered, but reject 1710's arguments to the contrary. Given Daniels testimony that he sometimes collected rents from other tenants in the Building (Daniels Testimony, Tr. at 21:18-25; *see*

Daniels worked no more than 172 hours per month (40 hours/week x 4.3 weeks/month). Accordingly, Daniels' regular hourly wage was $11.63 ($2000/172 = $11.62790), which far exceeds the minimum wage during the relevant period. *See* 29 U.S.C. § 206(a)(1) (from July 24, 2007 to July 23, 2008, the federal minimum wage is $5.85 per hour, from July 24, 2008 to July 23, 2009, it was $6.55 per hour, and on July 24, 2009, it became $7.25 per hour).

\*      \*      \*

Because Daniels has not produced sufficient, credible evidence of the amount and extent of his work as a matter of just and reasonable inference, he has not met his burden under the FLSA to demonstrate that he performed any work for which he was not properly compensated. *See Grochowski v. Phoenix Constr.*, 318 F.3d 80, 88-89 (2d Cir. 2003) (testimony that plaintiffs "'usually' worked" certain hours and did not know if they worked all Saturdays was "only speculation to establish what hours these plaintiffs worked" and did not allow a fact finder "to draw a reasonable inference about how many hours [plaintiff] worked"); *Kolesnikow*, 622 F. Supp. 2d at 118-19 (plaintiff's testimony that she worked an unspecified amount of time over forty hours, that she "sometimes" worked through her half-hour lunch break, and that she worked an unspecified amount of time past the end of her shift two or more times a week failed to

---

*also* Sicherman Testimony, Tr. at 113:7-22), he was qualified to testify concerning the approximate rental value of his apartment. Also, given Sicherman's testimony that the superintendent who replaced Daniels was given Daniels' old apartment, it is clear that it was customary for 1710 to provide its superintendents with free apartments. (*Id.* at 120:1-18; *see also id.* at 88:25-89:5 (fairly implying that an apartment was part of the compensation for the position of building superintendent).

provide a sufficient basis to infer that she worked more than forty hours in any given week).[9]

Accordingly, judgment must be entered for 1710 on Daniels' first cause of action.

### III. Daniels' State Labor Law Claim is Dismissed Without Prejudice

Because Daniels' FLSA claim is without merit, and because he has withdrawn his minimum wage and overtime claims under New York Labor Law, I decline to exercise supplemental jurisdiction over his third cause of action, which alleges failure to pay wages weekly in violation of New York Labor Law Section 191. (Joint Pretrial Order at 3). While that claim is tangentially related to his FLSA claim in that it generally involves the payment of wages, it presents novel and complex issues of State law, and is therefore properly dismissed. *See* 28 U.S.C. § 1367 (c)(1) and (c)(3). The interrelation between Section 191 and New York State Department of Labor's Minimum Wage Order for the Building Services Industry, 12 N.Y.C.R.R. § 141, *et seq.*, is a matter best handled in the first instance by the courts of the State of New York. *See generally Seabrook v. Johnson*, 153 F.3d 70, 72 (2d Cir. 1998) ("Where a pendent state claim turns on novel or unresolved questions of state law, . . . principles of federalism and comity may dictate that these questions be left for decision by the state courts."); *Young v. New York City Transit Auth.*, 903 F.2d 146, 163-64 (2d Cir. 1990) ("[N]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."). Accordingly, Daniels' third cause of action alleging failure to pay wages weekly is dismissed without prejudice.

---

[9] I have considered the parties' other factual and legal arguments in their many pre- and post-trial submissions and find them to be either without merit, or irrelevant in light of the findings of fact and conclusions of law contained herein.

## CONCLUSION

For the foregoing reasons, judgment shall be entered in favor of defendant for Daniels' FLSA claim, and his New York Labor Law Section 191 claim is dismissed without prejudice. The Clerk of the Court is directed to enter judgment forthwith, and promptly close this case.

Dated: August 17, 2011
       Brooklyn, New York

*Ramon E. Reyes, Jr.*
Ramon E. Reyes, Jr.
United States Magistrate Judge